UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Case # 21-CR-6108-FPG

v.

DECISION AND ORDER

JI WANG,

Defendant.

## INTRODUCTION

On November 4, 2025, a jury found Defendant Ji Wang guilty of economic espionage by copying (Count 1), economic espionage by possession (Count 3), theft of trade secrets by possession (Count 4), attempted economic espionage (Count 5), and attempted theft of trade secrets (Count 6). ECF No. 205. Defendant was acquitted of theft of trade secrets by copying (Count 2) and attempted theft of trade secrets (Count 7). *Id.* Defendant now renews his motion for the Court to enter a judgment of acquittal on Counts 1, 3, 4, 5, and 6, or in the alternative, for the Court to reduce the convictions to lesser included offenses to the extent supported by the evidence pursuant to Federal Rule of Criminal Procedure 29. ECF No. 211. The government opposes the motion. ECF No. 215. For the reasons described below, Defendant's Rule 29 motion is DENIED.

## LEGAL STANDARD

Under Rule 29, the Court may "set aside [a guilty] verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). Rule 29 erects a formidable barrier between the defendant and a judgment of acquittal. *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) ("[A] defendant challenging the sufficiency of the evidence that led to his conviction at trial 'bears a heavy burden,' as the standard of review is 'exceedingly deferential[.]'" (citations omitted)). The Court must uphold the verdict if, after viewing the evidence in the light most favorable to the government, "*any* rational trier of

1

fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Barrett*, 848 F.3d 524, 534 (2d Cir. 2017) (quoting *United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006)). In other words, the Court "may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* The Court must consider the evidence in totality, not in isolation, *United States v. Zhou*, 428 F.3d 361, 369–70 (2d Cir. 2005), and "defer to the jury's determination of witness credibility, the weight of the evidence, and the reasonable inferences [it drew] from the evidence," *Barrett*, 848 F.3d at 534.

"[T]he jury's verdict may rest entirely on circumstantial evidence," *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003), and the government "need not exclude every reasonable hypothesis other than that of guilt" when it presents its case, *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (citation and quotation marks omitted). Indeed, in a case where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Spoor*, 904 F.3d 141, 148 (2d Cir. 2018) (quoting *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013)) (internal quotation marks omitted).

## BACKGROUND

The Court assumes the parties' familiarity with the factual background of this case and will therefore only briefly summarize the facts relevant to this motion. On June 24, 2021, the Grand Jury indicted Defendant on ten counts. ECF No. 1. Three of the counts were dismissed prior to trial. ECF No. 89. The remaining counts pursued at trial were (Count 1) economic espionage by copying in violation of 18 U.S.C. § 1831(a)(2); (Count 2) theft of trade secrets by copying in violation of 18 U.S.C. § 1832(a)(2); (Count 3) economic espionage by possession in violation of 18 U.S.C. § 183l(a)(3); (Count 4) theft of trade secrets by possession in violation of 18 U.S.C. §1832(a)(3); (Count 5) attempted economic espionage in violation of 18 U.S.C. § 1831(a)(4);

2

(Count 6) attempted theft of trade secrets 18 U.S.C. § 1832(a)(4); and (Count 7) attempted theft of trade secrets in violation of 18 U.S.C. §1832(a)(4). *See* ECF No. 1.

Generally speaking, the indictment alleged that Defendant was an employee at Corning Incorporated ("Corning"), who worked on Defense Advanced Research Projects Agency ("DARPA") projects. *Id.* at 1–2. The indictment alleged that on July 1, 2016, Defendant downloaded from Corning's network a copy of a folder containing the DARPA Laser Fiber Manufacturing Technology Files onto a personal USB drive. *Id.* at 7. The indictment alleged that these files contained trade secrets owned by Corning. *Id.* at 4. The indictment further alleged that Defendant and Defendant's business partner used the DARPA files to establish their laser fiber business, which they referred to as Quantum Wave. *Id.* at 5. The indictment alleged that Defendant attempted to negotiate with investors to fund his new company in both China and the United States but was unsuccessful. *Id.* at 6–7.

As to the allegations related to downloading the DARPA files, at trial, Defendant testified that on July 1, 2016, he downloaded fifteen DARPA files ("the DARPA files") on to an unencrypted USB device, and that he was unaware of any prohibition on downloading files to a USB device. Tr.[1] 1144, 1197, 1284. He also testified that he moved these files onto his personal laptop and that he was not permitted to have Corning's trade secrets on his personal laptop. *Id.* at 1197–98. The government asked Defendant numerous times if he moved the files onto his personal laptop to refresh his memory for his business, Quantum Wave, and each time, Defendant denied that he did so. *Id.* at 1242, 1244, 1270. However, Christopher O'Neill, a Special Agent with the United States Department of Commerce, Bureau of Industry and Security Office of Export Enforcement who interviewed Defendant in 2018 and 2019 as a part of the investigation related to

---

[1] "Tr." refers to the trial transcript in this matter.

this action, testified otherwise. *Id.* at 1444–45. Agent O'Neill testified that when he interviewed Defendant in 2018, Defendant indicated that he did not recall downloading the DARPA files, but said that "if he downloaded them, he downloaded them for reference for Quantum Wave and to refresh his memory." *Id.* at 1445, 1455, 1459. Agent O'Neill added that when he interviewed Defendant for the second time in 2019, Defendant indicated that he downloaded the files to assist Dan Hawtof. *Id.* at 1455, 1459. Agent O'Neill also testified that when he explained that there was a discrepancy between Defendant's answer to the question of why he downloaded the files onto his personal laptop in his first interview and his answer in the second interview, Defendant denied ever saying that he downloaded the files for reference for Quantum Wave. *Id.* at 1459.

Additionally, the government introduced evidence related to Corning's employment policies, including Corning's 2017 Information Security Policy (Gov. Exh. 2), Corning's 2017 Information Security Procedures (Gov. Exh. 3), and Corning's 2017 IT Acceptable Use Policy (Gov. Exh. 4). The 2017 Information Security Procedures explained Corning's procedures for keeping its information and contained provisions that stated "[u]se Corning information only for Corning's benefit and consistent with Corning's business interests" and that employees should "[n]ever store Corning Restricted information on a personal file sharing/storage account, laptop, tablet, hard drive or USB device." Gov. Exh. 3 at 2, 8. The 2017 IT Acceptable Use Policy gave instructions for how employees were to use removable media and storage devices and stated that "[r]emovable media and storage devices must be encrypted" and that "[i]ndividuals requiring removable media and storage devices to support their job function or where legitimate business reasons exist, must submit a request through CLICK3000, or call the ITSCS." Gov. Exh. 4 at 5.

Regarding the allegations that Defendant established a laser fiber business and negotiated with potential investors, at trial, the government provided numerous exhibits to support these allegations. First, the government provided Defendant's "Specialty Optical Fibers Project

4

Investment Cooperation Agreement." Gov. Exh. 355T. That agreement discussed a "project company" named "Tianjin Wave Quantum LTD," with the company intending to create "optical fiber laser fiber. . . [and] other specialty optical fiber products suitable for market demand." *Id.* at 2. The agreement named three entities that were to be parties to the agreement (1) Tianjin Binhai Huaming Development and Construction Co., Ltd., (2) Defendant and his business partner, and (3) Zhongke Harglo Institute of Applied Laser Technology Co., Ltd. *Id.* at 2. The agreement also indicated that based on capital and intellectual property contributions, each party would get certain shares of the project company. *Id.* at 3. The agreement stated that the parties would operate "based on the principle of sincere cooperation and mutual benefit" to "build a first-ever domestic and world-leading high-tech enterprise in the field of specialty optical fiber manufacturing, to fill the gap in the domestic specialty optical fiber market." *Id.* at 2.

Second, the government provided another draft cooperation agreement titled "The Special Optical Fiber Project Investment and Cooperation Agreement." Gov. Exh. 850T. This agreement involved three parties, (1) Tianjin Binhai Huaming Development and Construction Co. Ltd., (2) Dr. Wang and his business partner, and (3) CAS Heguang (Tianjin) Applied Laser Technology Research Institute Co. Ltd. *Id.* at 2. The agreement outlined each party's responsibilities and contributions to a potential new company and stated that Defendant and his business partner would "ensure that sales of [the company would] reach 5 million and [a] tax contribution [of] . . . 500,000 [Chinese Yuan "RMB"]" in the second year and that "sales [would] reach RMB 100 million and [a] tax contribution [of] RMB 10 million" in the fourth year. *Id.* at 7.

Third, the government provided business plans created by Defendant. Gov. Exhs. 703AT at 8, 980AT at 2. Two of the business plans stated that Defendant's technology could be used for direction finders in military vehicles. Gov. Exhs. 703AT at 8, 980AT at 2. One of the plans stated that if satellite navigation systems were destroyed, direction finders enabled by Defendant's

company would "be the key to deciding victory or defeat." Gov. Exh. 703AT at 8. The business plans further stated that "[i]f this type of direction finders [sic] is to be installed on all the tanks, the market would be huge." Gov. Exh. 980AT at 2. Defendant's business plans also showed that he intended to manufacture all manner of specialty optical fibers, Gov. Exhs. 68T, 703AT, 980AT, that he listed Corning as an "International[] Competitor", Gov. Exh. 703AT at 9, and that he intended to make a profit based on his company, Gov. Exh. 68T at 22.

Fourth, the government provided evidence that Defendant sought and obtained sponsorship of his company through the People's Republic of China's (the "PRC") Thousand Talents Program. *See* Gov. Exh. 299T at 58. Specifically, the government provided a message from Lao Fan, the person who sponsored Defendant's application, that indicated that Defendant's Thousand Talents application had been approved. *Id.* Additionally, the government provided a congratulatory message regarding the Thousand Talents Program acceptance. Gov. Exh. 349T at 75.

Fifth, the government provided evidence that Defendant coordinated the installation of equipment and the initial testing of a fiber. Specifically, the government provided an email exchange from May 17, 2015, between Defendant, his business partner, and Zhanyang Qin, which stated that "[e]quipment testing is expected to be completed within this week." Gov. Exh. 710T at 2. In addition, the government provided an exchange between Defendant, his business partner, and Choqi Hou from June 2, 2015, in which Choqi Hou stated that the attachment to the email included "the recent refractive index test results of the single-mode preform" and asked Defendant and his business partner to "take a look and let [him] know if it's suitable for jacketing and fiber drawing." Gov. Exh. 717T at 1.

The government also provided expert testimony related to Defendant's alleged business development and negotiations. One expert who testified was Professor Barry Naughton, a Professor and So Kwan Lok Chair of Chinese International Affairs School of Global Policy and

Strategy at the University of California San Diego. ECF No. 976.  Professor Naughton testified that Tianjin Binhai Huaming Development and Construction Co., Ltd. was a local government instrumentality of the PRC, and that HARGLO was a state-owned facility under government control through the Chinese Academy of Sciences' Academy of Optoelectronics. Tr. 825–28, 833. Professor Naughton also testified that Defendant's proposed venture would have benefited all levels of the PRC government hierarchy because the Academy of Optoelectronics' "primary mission" was "the technology transfer," while the Tianjin City government's priority was to "introduce technologies, introduce talents, fill the domestic gap and achieve industrial upgrade" in China. Tr. 835–36, 855. Professor Naughton testified that the specialty optical fiber technology was "hugely important to the Chinese government in terms of strategic and even military strength." Tr. 860. Further, Professor Naughton testified that the PRC government designed the Thousand Talents Program to recruit overseas technical talent to build the PRC's scientific and technological capability. Tr. 839–40.

Another expert who testified was Dr. John Ballato, a Professor of Materials Science and Engineering at Clemson University. *See* ECF No. 97. Dr. Ballato testified that Corning's technology would have been directly applicable to advancing Defendant's development and commercialization of specialty optical fibers. Tr. 1068–70, 1079–93. Additionally, Dr. Ballato discussed how, even if Defendant's technology differed from Corning's in some respects, the use of Corning's trade secrets would have significantly accelerated the development of new fibers pursuant to Defendant's plan. *Id.*

Additionally, the Government provided testimony related to Corning's operations and its development of the DARPA files. One witness who testified about this was Kevin Bennett, a Senior Manager of Operations and Engineering at Corning. Tr. 406. Mr. Bennett testified that even though the DARPA project ended and Corning had left the fiber laser market, there were times

where Corning had considered reentering the fiber laser market. *Id.* at 479–80. Mr. Bennett also testified that Corning places significant value on technology it creates but may not immediately commercialize. *Id.* To support this assertion, Mr. Bennett gave the example of Gorilla Glass, which was developed by Corning in the 1960s, but was not commercialized until 2008, when it was used for the first generation of cell phone glass. *Id.* at 480. Mr. Bennett further testified that there is a group at Corning that continuously evaluates Corning's technologies "that have been on the shelf" to determine whether Corning should "try and bring it back or not." *Id.* Furthermore, Mr. Bennett testified that the DARPA files at issue would have assisted Defendant in achieving the technology he described in his business plans, and that specialty optical fibers is a market in which Corning competes. *Id.* at 481, 530–36.

Regarding the allegations that Defendant attempted to start a business in China using information from the DARPA files, at trial, Defendant testified that he attempted to start a business in China and that he made trips to China. *Id.* at 1156–57, 1180, 1199. However, Defendant maintained that he never brought the USB device with the files on it with him to China and that he never shared any files or data from the from the USB device with a third party. *Id.* at 1156–57, 1180. He also maintained that he never wanted to harm Corning or the United States, that he did not intend to give a benefit to the PRC, and that if he was selected for the Thousand Talent Program, he refused to participate. *Id.* at 1193–94, 1268. He further testified that while he had his potential company appraised to evaluate the value of the intellectual property associated with it, he did not share any of Corning's intellectual property with anyone as a part of the appraisal process. *Id.* at 1188–89, 1252. In addition, Defendant testified that he continued to work at Corning until he was placed on leave in 2018 and then ultimately fired in 2019. *Id.* at 1193.

After a fifteen-day trial, the jury found Defendant guilty on Counts 1, 3, 4, 5, and 6. ECF No. 205. The jury acquitted Defendant on Counts 2 and 7. *Id.* Defendant now moves for the Court

to enter a judgment of acquittal on Counts 1, 3, 4, 5, and 6 or, in the alternative, for the Court to reduce the convictions to lesser included offenses to the extent supported by the evidence pursuant to Federal Rule of Criminal Procedure 29. ECF No. 211.

### DISCUSSION

Defendant argues that the Court must grant his Rule 29 motion for seven reasons. *See* ECF No. 211-1. First, he argues that the jury's acquittal on Count 2 fatally undermines the conviction on Count 1. *Id.* at 15. Second, he argues that as to Counts 1, 3, and 4, the government failed to prove that Defendant acted without authorization. *Id.* at 16. Third, he argues that, as to Counts 1, 3, and 5, the government failed to prove intent to benefit a foreign government, foreign instrumentality, or foreign agent. *Id.* at 19. Fourth, he argues that as to Counts 5 and 6, the government failed to prove a substantial step toward commission of the offenses. *Id.* at 21. Fifth, he argues that as to Counts 1, 3, 4, 5, and 6, the government's improper rebuttal argument in its summation presented the jury with an uncharged theory of conviction, and that the jury instructions did not cure the error. *Id.* at 22. Sixth, he argues that as to Counts 4 and 6, the government failed to prove intent to convert trade secrets to the economic benefit of others. *Id.* at 24. Finally, he argues that as to Counts 4 and 6, the government failed to prove intent to injure Corning. *Id.* The Court discusses each argument in turn.

## I.    First Argument

Defendant's first argument is that the jury's acquittal on Count 2 fatally undermines Defendant's conviction on Count 1. *Id.* at 15. Specifically, Defendant argues that Count 1 and Count 2 are based on the same act, that is, they are both based on Defendant's download of the fifteen DARPA files on July 1, 2016. *Id.* Count 2 charged Defendant with theft of trade secrets under 18 U.S.C. § 1832(a)(2) while Count 1 charged economic espionage by copying under 18 U.S.C. § 1831(a)(2). *Id.* Therefore, Defendant argues that the elements the government needed to

prove beyond a reasonable doubt are the same for each count, except that Count 1 requires proof of an additional element that Defendant acted "intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent." *Id.* (quoting § 1831(a)(2)). Consequently, Defendant argues that if the jury could not find these elements satisfied for the same act as to Count 2, it is logically impossible for a rational jury to find the more demanding elements of Count 1 satisfied. *Id.* at 16.

The Court rejects this argument because it is simply untrue that the elements the government were required to prove for Count 1 and Count 2 are identical but for an additional element on Count 1 that Defendant acted intending or knowing that the offense would "benefit any foreign government, foreign instrumentality, or foreign agent." *Id.* (quoting § 1831(a)(2)). For Count 1, economic espionage by copying, the government was required to prove beyond a reasonable doubt that (1) the DARPA Laser Fiber Manufacturing Technology Files contained a trade secret, namely, DARPA Laser Fiber Manufacturing Technology; (2) Defendant knew that the DARPA Laser Fiber Manufacturing Technology Files contained a trade secret, namely, DARPA Laser Fiber Manufacturing Technology; (3) that on or about July 1, 2016, in the Western District of New York, Defendant knowingly copied, duplicated, or downloaded the DARPA Laser Fiber Manufacturing Technology Files without authorization; and (4) that Defendant intended or knew that his actions would benefit a foreign government, foreign instrumentality, or foreign agent. Tr. 1633–34.

As for Count 2, theft of trade secrets by copying, the government was required to prove beyond a reasonable doubt that (1) the DARPA Laser Fiber Manufacturing Technology was a trade secret; (2) Defendant intended to convert the DARPA Laser Fiber Manufacturing Technology to the economic benefit of anyone other than the trade secret's owner; (3) Defendant knew that the DARPA Laser Fiber Manufacturing Technology was a trade secret; (4) that on or about July 1,

10

2016, in the Western District of New York Defendant knowingly copied, duplicated, or downloaded without authorization the DARPA Laser Fiber Manufacturing Technology Files, which contained the DARPA Laser Fiber Manufacturing Technology; (5) the DARPA Laser Fiber Manufacturing Technology was related to or included in a product used in or intended for use in interstate or foreign commerce; and (6) Defendant intended or knew that this action would injure the owner of the DARPA Laser Fiber Manufacturing Technology. *Id.* at 1644–45.

Therefore, there are two elements as to Count 2 that have no analogous elements in Count 1—namely, element five that the DARPA Laser Fiber Manufacturing Technology was related to or included in a product used in or intended for use in interstate or foreign commerce and element six that Defendant intended or knew that this action would injure the owner of the DARPA Laser Fiber Manufacturing Technology. *See id.* at 1633–34, 1644–45. As such, Defendant's argument fails because the acquittal on Count 2 does not necessarily undermine Defendant's conviction on Count 1 because it is not logically impossible for a rational jury to find the elements of Count 1 satisfied while finding the elements of Count 2 not satisfied. Consequently, the Court concludes that there is no merit to Defendant's first argument.

## II.    Second Argument

Defendant's second argument is that the government failed to prove that Defendant acted "without authorization," as required for Counts 1, 3, and 4. ECF No. 211-1 at 16. Defendant maintains that the government's theory as to the "without authorization" element is that Defendant violated Corning's IT policies by downloading files to a non-encrypted USB device. *Id.* However, Defendant argues that this theory was undermined by the evidence at trial, and therefore, the government failed to prove this element. *Id.* The government responds that its theory that Defendant acted "without authorization" encompassed more than downloading files on to a non-encrypted USB device. *See* ECF No. 215 at 5. The government argues that it sufficiently proved

11

that Defendant acted without authorization by providing evidence that Defendant copied files onto his personal laptop, possessed the files on his personal laptop, and attempted to misappropriate the files for personal use all in violation of Corning's company policies. *Id.*

At trial, the government introduced Exhibits 2, 3, and 4 into evidence. *See* ECF No. 166. Exhibit 2 is Corning's 2017 Information Security Policy.  Exhibit 3 is Corning's 2017 Information Security Procedures. Exhibit 4 is Corning's 2017 IT Acceptable Use Policy. As relevant here, Exhibit 3 contained a provision that stated that the employees must "[u]se Corning information only for Corning's benefit and consistent with Corning's business interests." Gov. Exh. 3 at 2. Exhibit 3 also contained a provision that stated "[n]ever store Corning restricted information on a personal file sharing/storage account, laptop, tablet, hard drive or USB device." *Id.* at 8. Exhibit 4 contained a provision stating that "[r]emovable media and storage devices must be encrypted" and that "[i]ndividuals requiring removable media and storage devices to support their job function or where legitimate business reasons exist, must submit a request through CLICK3000, or call the ITSCS." Gov. Exh. 4 at 5.

When testifying at trial, Defendant conceded that in July 2016, he downloaded the DARPA files at issue onto an unencrypted USB device. Tr. 1144, 1284. He also conceded that he moved these files onto his personal laptop and that he was not permitted to have Corning's trade secrets on his personal laptop. *Id.* at 1197–98. Defendant denied that he moved the files onto his personal laptop to refresh his memory for his business, Quantum Wave. *Id.* at 1270. However, Agent O'Neill testified that when he interviewed Defendant in 2018, Defendant indicated that he did not recall downloading the DARPA files, "but if he downloaded them, he downloaded them for reference for Quantum Wave and to refresh his memory." *Id.* at 1459. Agent O'Neill added that when he interviewed Defendant for the second time, Defendant indicated that he downloaded the

12

files to assist Dan Hawtof, and that Defendant denied ever saying that he downloaded the files for reference for Quantum Wave. *Id.*

This evidence, taken together and viewed in the light most favorable to the government, provides ample support for the jury's conclusion that Defendant acted without authorization. As Defendant notes, one of the elements of Counts 1, 3, and 4 is that the government must prove that Defendant knew that the DARPA Laser Fiber Manufacturing Technology was obtained "without authorization." Tr. 1634, 1656, 1668. Defendant argues that downloading files on to the USB device was not unauthorized because Defendant downloaded the files through Corning's own Checkpoint security system, which detected the "download and permitted it to proceed without generating an alert, triggering a block, or initiating an investigation." ECF No. 211-1 at 17. Defendant also argues that he testified that he was unaware of any prohibition on downloading to the USB device and that the system permitted the download. *Id.* at 18.

The Court rejects these arguments. First, the fact that Corning's security did not stop the download does not mean that the download was authorized. While Defendant provided testimony that he was unaware of the prohibition on downloading files to a USB device and conceded that the USB device he used to download the DARPA files was unencrypted, *see* Tr. 1284, the government provided evidence that Corning's policies prohibited downloading documents onto unencrypted USB devices, *see* Gov. Exh. 4 at 5. Therefore, a jury could conclude that when Defendant downloaded the DARPA files onto the unencrypted USB device, he did so without authorization.[2] Second, the government provided evidence that Corning did not allow "Corning

---

[2] To the extent that Defendant argues that the download to the USB device cannot be the basis for finding that Defendant acted without authorization because Defendant was unaware that this was unauthorized, the Court rejects this argument because Defendant only cites case law related to fraud to support this argument, which is not relevant in this case. *See* ECF 211-1 at 18. Additionally, even if the Court were to assume that Defendant's belief that he was authorized to download the DARPA files to the USB device rendered such evidence insufficient to prove the "without authorization" element, as will be discussed below, the government provided other sufficient evidence that Defendant acted without authorization and therefore, the Court rejects this argument.

restricted information" to be stored on a personal laptop. Gov. Exh. 3 at 2. At trial, Defendant testified that he moved the DARPA files onto his personal laptop and that he was not permitted to have Corning's trade secrets on his personal laptop. Tr. 1197–98. There is no dispute that at least some of DARPA files that Defendant moved to his personal laptop contained trade secrets. *Id.* at 1196. Again, this is sufficient evidence such that a jury could conclude that Defendant acted without authorization. Finally, the government provided evidence that Corning's policies stated that Corning information could only be used for "Corning's benefit and consistent with Corning's business interests." Gov. Exh. 3 at 2. The government provided evidence that Defendant had previously indicated that he used the DAPRA files on his laptop to refresh his memory for his business venture Quantum Wave. Tr. 1459.[3] Once again, this is sufficient evidence such that a jury could conclude that that Defendant acted without authorization. Therefore, there is no merit to Defendant's second argument.

## III.    Third Argument

Defendant's third argument is that as to Counts 1, 3, and 5, the government failed to prove that Defendant acted "intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent." ECF No. 211-1 at 19 (quoting 18 U.S.C. § 1831(a)). Specifically, Defendant argues that the government's only evidence that Defendant intended to benefit a foreign government is "(1) preliminary business negotiations that [Defendant] abandoned; (2) a Thousand Talents Program application that was revoked; (3) business plans that referenced potential military applications in one early draft; and (4) [Defendant's] travel to China."

---

[3] Defendant also argues that the government's reliance on a 2017 policy to prove a 2016 violation, combined with the ambiguity of the policies actually in effect, falls short of proof beyond a reasonable doubt. ECF No. 211-1 at 18–19. However, Defendant provides no explanation for why such a policy could not be used to prove a 2016 violation, where the government provided evidence that the policy was unchanged from 2016 to 2017, *see* Gov. Exhs. 4 at 13–14; Tr. 378–79. Defendant also provides no explanation as to what he believes is ambiguous about these policies. Therefore, the Court rejects this argument.

*Id.* at 20. Defendant maintains that under relevant case law, this evidence is insufficient to sustain the convictions on Counts 1, 3, and 5. *See id.* at 19–21.

The Second Circuit has held that § 1831(a) is "expressed broadly." *United States v. Aleynikov*, 676 F.3d 71, 79 (2d Cir. 2012). Accordingly, the Second Circuit has held that under § 1831(a), the "benefit" a defendant "intended to confer on the foreign government, or instrumentality need not have been an economic benefit," but instead could be a "strategic, tactical, or reputational benefit." *United States v. Zheng*, 113 F.4th 280, 295 (2d Cir. 2024). Additionally, the relevant statute defines the phrase broadly. Thus, "foreign government, instrumentality, or agent" should be understood to include not only a foreign government itself, but also any "agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government, as well as any officer, employee, proxy, servant, delegate, or representative of a foreign government." 18 U.S.C. § 1839.

The government argues that, at trial, it provided evidence of several ways that Defendant intended to benefit the PRC government, its subcomponents, its military, and its economy. ECF No. 215. The Court agrees. First, the government provided Defendant's "Specialty Optical Fibers Project Investment Cooperation Agreement." Gov. Exh. 355T. That agreement discussed a "project company" named "Tianjin Wave Quantum LTD," with the company intending to create "optical fiber laser fiber. . . [and] other specialty optical fiber products suitable for market demand." *Id.* at 2. The agreement named three entities that were to be parties to the agreement. The first party was Tianjin Binhai Huaming Development and Construction Co., Ltd. *Id.* at 2. The second party was Defendant and his business partner. *Id.* And the third party was Zhongke HARGLO Institute of Applied Laser Technology Co., Ltd. *Id.* The agreement also indicated that based on capital and intellectual property contributions, each party would get certain shares of the

15

project company. *Id.* at 3. The agreement stated that the parties would operate "based on the principle of sincere cooperation and mutual benefit" to "build a first-ever domestic and world-leading high-tech enterprise in the field of specialty optical fiber manufacturing, to fill the gap in the domestic specialty optical fiber market." *Id.* at 2.

Second, the government provided an expert, Professor Naughton, who testified that Tianjin Binhai Huaming Development and Construction Co., Ltd. was a local government instrumentality of the PRC, and that HARGLO was a state-owned facility under government control through the Chinese Academy of Sciences' Academy of Optoelectronics. Tr. 825–28, 833. Professor Naughton also testified that the proposed venture would have benefited all levels of the PRC government hierarchy because the Academy of Optoelectronics' "primary mission" was "the technology transfer," while the Tianjin City government's priority was to "introduce technologies, introduce talents, fill the domestic gap and achieve industrial upgrade" in China. Tr. 835–36, 855.

Third, the government provided a draft cooperation agreement with PRC government entities that stated that Defendant and his business partner would "ensure that sales of [the company would] reach 5 million and [a] tax contribution [of] . . . 500,000 [Chinese Yuan "RMB"]" in the second year and that "sales [would] reach RMB 100 million and [a] tax contribution [of] RMB 10 million" in the fourth year. Gov. Exh. 850T at 7.

Fourth, the government provided Defendant's business plans, which contemplated military benefits for the PRC. Gov. Exhs. 703AT at 8, 980AT at 2. Specifically, two versions of the business plans stated that Defendant's technology could be used for direction finders in military vehicles. *Id.* The plans stated that if satellite navigation systems were destroyed, direction finders enabled by Defendant's company would "be the key to deciding victory or defeat." Gov. Exh. 703AT at 8. The business plans further stated that "[i]f this type of direction finders [sic] is to be installed on all the tanks, the market would be huge." Gov. Ex. 980AT at 2. Further, Professor

16

Naughton testified that the specialty optical fiber technology was "hugely important to the Chinese government in terms of strategic and even military strength." Tr. 860.

Fifth, the government provided evidence that Defendant sought and obtained sponsorship of his company through the PRC's Thousand Talents Program. *See* Gov. Exh. 299T at 58. Specifically, the government provided a message from Lao Fan, the person who sponsored Defendant's application, that indicated that Defendant's Thousand Talents application had been approved, Gov. Exh. 299T, and a congratulatory message regarding the Thousand Talents acceptance, Gov. Exh. 349T at 75. Professor Naughton testified that the PRC government designed that program to recruit overseas technical talent to build the PRC's scientific and technological capability. Tr. 839–40.

Finally, the government, through the testimony of its expert witness, Dr. Ballato, provided evidence that the benefits Defendant intended for the PRC and its instrumentalities were related to his theft of Corning's trade secrets. Dr. Ballato provided testimony describing how Corning's technology would have been directly applicable to advancing Defendant's development and commercialization of specialty optical fibers. Tr. 1068–70, 1079–93. Dr. Ballato also described how, even if Defendant's technology differed from Corning's in some respects, the use of Corning's trade secrets would have significantly accelerated the development of new fibers pursuant to Defendant's plan. *Id.*

This evidence, as summarized above, taken together and viewed in the light most favorable to the government, provides ample support for the jury's conclusion that Defendant intended to benefit the PRC and/or its instrumentalities.[4] Thus, the Court rejects Defendant's third argument.

---

[4] To the extent that Defendant argues that the Second Circuit's holding in *Zheng* demonstrates that the evidence in this case was insufficient to prove that Defendant intended to benefit a foreign government or instrumentality, the Court rejects that argument. *See* ECF No. 211-1 at 19–20 (citing *Zheng*, 113 F.4th at 296–97). While the Court agrees that the evidence in this case is not the same as the evidence in *Zheng*, that decision only held that the evidence against the defendant in that case was sufficient, and therefore, does not indicate that the evidence against the Defendant in

## IV.    Fourth Argument

Defendant's fourth argument is that the government failed to prove a "substantial step" toward the commission of the offenses for Counts 5 and 6. ECF No. 211-1 at 21. Specifically, Defendant argues that the government's evidence of a "substantial step" for Counts 5 and 6 consisted only of Defendant's failed business negotiations with Chinese entities. *Id.* at 21–22. Because no agreement was reached, no partnership was formed, no business was established, no money was exchanged, and no trade secret information was ever conveyed, Defendant argues that the evidence of failed business negotiations is not strongly corroborative of criminal intent and therefore, insufficient to support the convictions on Counts 5 and 6. *Id.* at 22. The Court rejects this argument because there was ample evidence at trial to support the jury's conclusion that Defendant took a substantial step toward the commission of the underlying offenses in Counts 5 and 6.

For Count 5, the government was required to prove beyond a reasonable doubt that Defendant (1) intended to commit the crime of economic espionage; and (2) beginning in or about late 2014 and continuing to in or about 2017, in the Western District of New York, performed an act constituting a substantial step toward the commission of that offense. Tr. 1681–82. For Count 6, the government was required to prove beyond a reasonable doubt that Defendant (1) intended to commit the crime of theft of trade secrets; and (2) that beginning in or about late 2014 and continuing to in or about late 2017, in the Western District of New York, performed an act

---

this case is insufficient simply because it is different. *See Zheng*, 113 F.4th at 295–97. Further, the Court also rejects Defendant's argument that under *United States v. Pauling*, the evidence in this case was insufficient to prove that Defendant intended to benefit a foreign government or instrumentality. ECF No. 211-1 at 20 (citing 924 F.3d, 649 659 (2d Cir. 2019)). While Defendant maintains that the evidence in this case requires "conclud[ing] so much on the basis of so little" and that the evidence is "at least as consistent with innocence as with guilt," the Court disagrees because, as summarized above, there was ample evidence provided at trial to support the jury's conclusion that Defendant intended to benefit the PRC and/or its instrumentalities. *See id.* (citing *Pauling,* 924 F. 3d at 656, 659).

constituting a substantial step toward the commission of that offense. *Id.* at 1686–88. Because Defendant does not challenge the sufficiency of the evidence related to the intent prong, the Court will only discuss the evidence related to the substantial step prong.

"In order to establish that a defendant is guilty of an attempt to commit a crime, the government must prove that the defendant had the intent to commit the crime and engaged in conduct amounting to a substantial step towards the commission of the crime." *United States v. Pugh,* 945 F.3d 9, 20 (2d Cir. 2019) (quotation omitted). "For a defendant to have taken a 'substantial step,' he must have engaged in more than 'mere preparation,' but may have stopped short of 'the last act necessary' for the actual commission of the substantive crime." *Id.* (quoting *United States v. Yousef*, 327 F.3d 56, 134 (2d Cir. 2003)). "A defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed." *Id.*

A substantial step "is conduct planned to culminate in the commission of the substantive crime being attempted." *Id.* (quoting *United States v. Farhane,* 634 F.3d 127, 147 (2d Cir. 2011) (internal quotation marks omitted)). As the substantial step need not be the "last act necessary before commission of the crime the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished before commission of the substantive crime." *Id.* (quotation omitted). Further, "[i]n order for behavior to be punishable as an attempt, it need not be incompatible with innocence, yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute." *Id.*

Here, Defendant argues that the only evidence the government produced at trial of Defendant taking a "substantial step" for Counts 5 and 6 is Defendant's failed business

19

negotiations with Chinese entities. The Court disagrees. As explained above, a substantial step "is conduct planned to culminate in the commission of the substantive crime being attempted." *Pugh*, 945 F.3d at 20. For Count 5, the elements of the substantive crime, economic espionage, are (1) either that the information in question was a trade secret and that the defendant knew it was a trade secret, or that the defendant reasonably believed the information in question to be a trade secret; (2) that Defendant knowingly and without authorization stole, appropriated, or conveyed the trade secret; and (3) that Defendant intended or knew that his actions would benefit a foreign government, foreign instrumentality, or foreign agent. Tr. 1683–84. For Count 6, the elements of the substantive crime, theft of a trade secret, are (1) either that the information in question contained a trade secret and the defendant knew it contained a trade secret, or that the defendant reasonably believed the information in question contained a trade secret; (2) Defendant intended to convert the trade secret to the economic benefit of anyone other than the trade secret's owner; (3) that the defendant knowingly and without authorization stole, appropriated, or conveyed the information; (4) that the information was related to or included in a product or services used in or intended for use in interstate or foreign commerce; and (5) the defendant intended or knew that this action would injure the owner of the information. Tr. 1686–88.

Therefore, neither Count required that the government prove that Defendant was successful in his business negotiations. Instead, the government needed only to prove that Defendant took steps that would have culminated in the commission of economic espionage and theft of a trade secret. *See Pugh*, 945 F.3d at 20. At trial, the government presented evidence that Defendant (1) copied fifteen trade secret DARPA files on an unencrypted USB drive, Tr. 1144, 1197, 1284; (2) copied the DARPA files with trade secrets onto his personal laptop, *id.* at 1197–98; (3) possessed the DARPA trade secrets files on an unencrypted USB drive and personal laptop, *id.* at 1144, 1197, 1284; (4) drafted, revised, circulated, and presented versions of his business plan, Gov. Exhs. 68T,

703AT, 980AT; (5) negotiated potential contracts, Gov. Exhs. 355T, 850T; (6) traveled to China to meet with partners and potential investors, Tr. 1156–57; (6) engaged an appraisal to value the intellectual property he was contributing to the business venture, *id.* at 1188–89; and (7) coordinated the installation of equipment and the initial testing of a fiber, Gov. Exhs. 710T, 717T. This evidence, taken together and viewed in the light most favorable to the government, provides ample support for the jury's conclusion that Defendant engaged in a substantial step towards the commission of both economic espionage and theft of a trade secret.[5] As such, the Court rejects Defendant's fourth argument.

## V.    Fifth Argument

Defendant's fifth argument is that the government's improper rebuttal argument presented the jury with an uncharged theory of conviction, and that the Court's instructions did not cure this error. ECF No. 211-1 at 22. Defendant maintains that the government in its summation introduced a theory conviction that was not charged in the indictment. *Id.* at 23. Specifically, he takes issue with the government's statement that "[i]f you find that [Defendant] was planning on using what was in his head, that intangible information it's called, in his head, Corning's trade secrets, to help China or to help some undercover agents start a fake business, that's enough, as long as he took a substantial step in furtherance of those opportunities." *Id.* (quoting Tr. 1604). At trial, Defense Counsel objected to this statement, and the Court stated that "the instructions will make it clear what the charges are." Tr. 1608. Defendant argues that the instructions did not cure this error because no curative instruction was given specifically addressing or withdrawing this argument

---

[5] Defendant also argues that the jury's acquittal on Count 7 demonstrates that preliminary negotiations that never resulted in an agreement cannot constitute a substantial step. ECF No. 211-1 at 22. The Court rejects that argument. As explained above, there was more evidence of a substantial step towards the commission of the underlying offenses than the preliminary negotiations and that evidence taken together provides ample support for the jury's conclusion that Defendant engaged in a substantial step.

and the general instructions did not tell the jury to disregard this argument. ECF No. 211-1 at 23. Defendant also argues that the jury's subsequent deliberations suggest that the jury was deliberating under the government's broader "knowledge theory" because the jury asked for legal clarifications and exhibit reviews but never requested single testimony readback. *Id.*

The Court is unpersuaded by this argument because even assuming that the government's closing argument was improper, the Court's instructions cured any error. Prior to closing arguments, the Court instructed the jury that "whatever the attorneys may say in their summations and however they say it is simply an argument for your consideration" and that "nothing the attorneys say is evidence." Tr. 1518. Further, the Court instructed the jury that the Court was "responsible for explaining the law, not the attorneys." *Id.* When providing the instructions of law to the jury, the Court reiterated that it was the jury's "sworn duty to follow the law exactly as I provide it to you." *Id.* at 1613. The Court further instructed the jury that "[y]ou have no right to question the wisdom or the correctness of any rule I'm about to state to you, and you must not substitute or follow your own notion or opinion as to what the law is or what you think it ought to be," and that "[i]t is for you alone to decide whether the government has proven that the defendant is guilty of the crimes charged, solely based on the evidence and subject to the law as I charge you." *Id.* at 1613, 1617. The Court then provided the substantive charges as to each count of the indictment. *Id.* at 1633–96.

"It is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge." *Britt v. Garcia*, 457 F.3d 264, 272 (2d Cir. 2006) (quotation omitted). Here, the Court instructed the jury multiple times that nothing the attorneys said in their closing arguments was evidence and that the jury must follow the law as the Court provided it. Further, the Court provided the substantive law to the jury. Defendant provides no evidence that the jury ignored these instructions other than speculation that the jury may have been deliberating under the

government's broader "knowledge theory" because the jury asked for legal clarifications and exhibit reviews but never requested single testimony readback. *See* ECF No. 211-1 at 23. Such speculation is insufficient to demonstrate that the jury did not follow the instructions. Therefore, the Court presumes that the jury followed its instructions, and to the extent that Defendant argues that the government presented the jury with an uncharged theory of conviction, the Court's instructions cured any error. To the extent that Defendant argues that a further curative instruction was needed, he neither made that objection at trial nor explained in the instant motion what further curative instruction would have been needed to rectify the issue. As such, the Court concludes that there is no merit to Defendant's fifth argument.

## VI.    Sixth Argument

Defendant's sixth argument is that as to Counts 4 and 6, the government failed to prove that Defendant acted "with intent to convert a trade secret . . . to the economic benefit of anyone other than the owner thereof." ECF No. 211-1 at 24 (quoting 18 U.S.C. § 1832(a)). Again, Defendant argues that he only engaged in preliminary business discussions that never resulted in any agreement, partnership, or business venture and that no trade secret information was ever used in any business venture. *Id.* Defendant further maintains that no one other than Defendant received any economic benefit from the files and that Defendant's concept was materially different from Corning's DARPA work. *Id.* As such, he argues that the government's theory that Defendant's business negotiations demonstrated his intent to convert trade secrets for the benefit of others is insufficient because Defendant may have intended to use his own knowledge and expertise, not Corning's trade secrets in connection with a potential business venture. *Id.*

The government responds that it presented ample evidence that Defendant intended to misappropriate Corning's trade secrets to further the development of his planned business venture, Quantum Wave, and therefore, the misappropriation of the trade secrets was done with the

23

intention to economically benefit Defendant and everyone else with a financial stake in Quantum Wave. ECF No. 215 at 23. Additionally, the government argues that Defendant concedes that he intended to benefit himself in his motion, which is sufficient under the statute to prove this element. *See id.* at 24.

The Court agrees with the government. The statute states that the government must prove that Defendant acted "with intent to convert a trade secret . . .  to the economic benefit of anyone other than the owner thereof." 18 U.S.C. § 1832(a). Therefore, if Defendant acted with the intent to benefit himself, this element is satisfied because there is no dispute that he is not the owner of the trade secrets at issue. *See United States v. Minh Hoang*, No. 17-CR-0444, 2019 WL 5696306, at *5 (D. Utah Nov. 4, 2019) (rejecting a defendant's argument that 18 U.S.C. § 1832(a) requires proof that a defendant acted with the intent to economically benefit a third party and finding that a defendant's intent to benefit himself could satisfy the requirement that a defendant acted with intent "to convert a trade secret . . .  to the economic benefit of anyone other than the owner thereof") (quoting 18 U.S.C. § 1832(a)). Here, Defendant states in his motion that "[n]o one other than Dr. Wang ever received any economic benefit from the files." ECF No. 211-1 at 24. Thus, he appears to concede that Defendant acted with intent to convert a trade secret at least to the economic benefit of himself, which would be sufficient to satisfy this element.

However, even if Defendant did not make this concession, at trial, the government provided as evidence testimony from Kevin Bennett that the DARPA files at issue would have assisted Defendant in achieving the technology he described in his business plans, Tr. 533–36, a 2017 investment agreement allocating investment and shares in Defendant's proposed company, Gov. Exh. 850T, and a business presentation demonstrating that Defendant intended to make a profit from his proposed company, Gov. Exh. 68T.  This evidence taken together and viewed in the light most favorable to the government, provides ample support for the jury's conclusion that Defendant

24

acted "with intent to convert a trade secret . . . to the economic benefit of anyone other than the owner thereof." 18 U.S.C. § 1832(a). As such, there is no merit to this argument.

## VII.    Seventh Argument

Defendant's final argument is that as to Counts 4 and 6, the government failed to prove that Defendant acted "intending or knowing that the offense will, injure any owner of that trade secret." ECF No. 211-1 at 25 (quoting 18 U.S.C. § 1832(a)). Defendant argues that the evidence showed that Defendant continued working at Corning for more than two years after the July 2016 download and that Defendant never used the file in any competing business. *Id.* Additionally, Defendant maintains that he never disclosed the files to a third party and that Corning was not actively competing in the fiber laser market. *Id.* Defendant also points to testimony that Defendant indicated that his intent was not to harm Corning. *Id.* He concludes that because the jury asked about harm twice during deliberations and never asked to rehear the testimony that was supposed to prove it, the evidence of intent to injure was marginal at best. *Id.*

In response, the government argues that it provided evidence that Defendant intended to injure Corning by creating a company that would compete with Corning in the market for specialty optical fibers. ECF No. 215 at 26–27. Specifically, the government points to (1) Defendant's business plans that showed he intended to manufacture all manner of specialty optical fibers, Gov. Exhs. 68T, 703AT, 980AT; (2) testimony that specialty optical fibers is a market in which Corning competes, Tr. 481, 530–34; (3) Defendant's business plan, which lists Corning as an "International[] Competitor", Gov. Exh. 703AT; (4) testimony that Corning places significant value on technology it creates but may not immediately commercialize such as Gorilla Glass, Tr. 479–80; and (5) testimony that there is a group at Corning that continuously evaluates Corning's shelved technology to determine whether Corning should "try and bring it back or not," Tr. 480. ECF No. 215 at 28.

The Court is unpersuaded by Defendant's arguments. As to his arguments that Defendant continued working at Corning, that he never used the files in any competing business, and that he never disclosed the files to a third party, the Court rejects them as Defendant cites no case law as to why that would be relevant to the Court's analysis as to the sufficiency of the evidence that Defendant intended to injure Corning. As to his argument that the jury deliberations indicate that the evidence as to this element was marginal, the Court rejects this argument because it is nothing more than speculation. As to his arguments that Corning had shelved the fiber laser technology, was not actively competing in the fiber laser market, and that it was never Defendant's intent to injure Corning, the government provided evidence that Corning was competing in the market, that Defendant identified Corning as a competitor, and that Corning places significant value on technology that it does not immediately commercialize. This evidence viewed in the light most favorable to the government, provides ample support for the jury's conclusion that Defendant acted "intending and knowing that the offense will injure any owner of that trade secret." 18 U.S.C. § 1832(a). Thus, there is no merit to Defendant's final argument.

## CONCLUSION

For the foregoing reasons, Defendant's Rule 29 motion, ECF No. 211, is DENIED.

IT IS SO ORDERED.

Dated: July 14, 2026

Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York

26